[No. F007896. Fifth Dist. Apr. 29, 1988.]

E.O.C. ORD, INC., Plaintiff and Appellant, v.
HERVEY KOVAKOVICH et al., Defendants and Respondents.

**COUNSEL**

Boyd & McKay and J. Scott McKay for Plaintiff and Appellant.

William R. McPike for Defendants and Respondents.

## OPINION

**STONE (W. A.), J.**—This appeal presents the issue whether the two-year statute of limitations for an action based upon an oral contract or the four-year statute for an action based upon a contract founded on an instrument in writing applies to the particular facts found by the trial court. Because we will hold that the four-year statute applies, we will address the additional issue of when plaintiff's contract action accrued in order to determine whether the action was timely filed.

It was March of 1978 when respondent Kovakovich[1] contacted appellant E.O.C. Ord, an attorney certified as a tax specialist, for the purpose of representing him and his wife in a tax deficiency action which had been filed by the Internal Revenue Service for the tax years 1966 and 1967. The action was set for trial in the United States Tax Court about two months later. Kovakovich had been referred to Ord by his general attorney, Vincent Todisco.

Ord and Kovakovich initially agreed that for $2,000 Ord would attempt to obtain a continuance of the trial, perform an investigation to determine whether any legal or factual basis existed for a reduction in the Internal Revenue Service assessment, explore the possibility of a quick settlement with the Internal Revenue Service, and give Kovakovich an appraisal of his situation. If a quick settlement with the Internal Revenue Service was not reached, it was up to Kovakovich to decide, after obtaining Ord's appraisal, whether he chose to challenge the Internal Revenue Service action further. If so, the parties were then to agree on the terms of Ord's fee for additional representation.

Ord secured a continuance of the trial and, after performing the other initial services which were required of him, he billed Kovakovich for the agreed fee of $2,000, which was paid without question or dispute.

On June 29, 1978, Ord and Kovakovich engaged in a telephone conversation. A letter dated the same day from Ord confirmed this conversation and

---

[1] Although both Hervey Kovakovich and his wife, Lucie, were defendants in the trial court and are respondents before this court, the evidence is undisputed that only Mr. Kovakovich participated in the transactions relevant to the issues before the trial court. Mrs. Kovakovich did not testify. Therefore, when "Kovakovich" is used in this opinion, the reference is to respondent Hervey Kovakovich only.

described not only the initial agreement and services fee, but stated that because to date the Internal Revenue Service had refused to consider a settlement, trial appeared likely unless a new theory or additional evidence could be developed to persuade the Internal Revenue Service to agree to settle on terms other than payment in full. The letter also related, "You have agreed to pay me a percentage of any decrease in tax, interest, and penalties over the current amounts now assessed. The exact percentage arrangements to be made between you and Vincent Todisco in a separate letter. . . . If you do not agree with these terms, please advise immediately." Kovakovich had verbally advised Ord he wished to discuss the matter with Todisco in order to determine what a fair percentage would be. However, Ord never received an answer to this letter from either Kovakovich or Todisco.

Nonetheless, Ord began preparing the case for trial. Continuances were periodically obtained. Jack Stuart, a former Internal Revenue Service employee, was hired to perform accounting, reconstruct records, and analyze the relevant documents. Stuart was paid directly by Kovakovich for his services.

The tax trial was eventually scheduled for June 1979. Realizing he still had not settled the contingency fee arrangement, Ord sent Kovakovich a letter dated May 1, 1979. The purpose of the letter was to ". ·. . review our fee agreement with you so there will be no misunderstanding." The letter related Ord was ". . . to get 50% of any reduction in the tax, penalties, and interest due to the date of judgment. This will be computed on the basis of the entire tax, interest and penalties due on the date of the judgment of the Tax Court assuming we lost completely minus the actual result. We then take 50% of the reduction. . . . If you disagree with this fee arrangement then please let me know right away." No response to this letter was received, so on May 18, 1979, Ord telephoned Kovakovich to discuss the fee arrangement. During this nine-minute telephone conversation Ord reviewed with Kovakovich the content of the May 1 letter. Ord testified, "in that telephone conversation [Kovakovich] agreed to the terms of the letter." Ord noted on his office copy of the letter, "Called Herv - went over fee letter, and he agreed. 5/18/79."

On May 22, Ord wrote to Kovakovich requesting he "sign a copy of the fee letter and send it back to me." Kovakovich did not do so.

A few days before the tax court trial was scheduled to begin, Ord was successful in securing a settlement with the Internal Revenue Service on behalf of the Kovakoviches. A stipulated decision, setting out the amount of

the deficiencies and penalties due, was entered in the tax court on June 20, 1979.

On January 4, 1980, Ord wrote to Kovakovich and stated that until the Internal Revenue Service tax bill was prepared and received, "I cannot figure out the exact amount of my fee based on our agreement. . . ." Thereafter, the Internal Revenue Service notified the Kovakoviches of the total sums due under the stipulated decision, and Stuart calculated the net saving to the Kovakoviches by virtue of the settlement was $30,243. Stuart notified Kovakovich of this amount on March 19, 1980, and Ord made demand for payment of one-half that amount, $15,121.50, pursuant to the fee arrangement.

On April 18, 1980, through Attorney Todisco, Kovakovich refused to pay the fee. Ord filed a complaint alleging breach of contract on January 11, 1984. Following a nonjury trial, the court held Ord's claim was governed by the two-year statute of limitations, Code of Civil Procedure,[2] section 339, subdivision 1, and was not timely filed. Judgment was entered for the Kovakoviches, and Ord appeals.

### Applicable Statute of Limitations

Our discussion centers on the significance of the letter dated May 1, 1979, from Ord to Kovakovich and the subsequent telephone conversation between them on May 18. The applicability of the principle set out in *Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528 [25 Cal.Rptr. 65, 375 P.2d 33] will determine the outcome of this appeal.

The evidence on the issue was quite simple. Ord testified he reviewed the terms of the May 1 letter with Kovakovich during the telephone call, and Kovakovich stated the terms were acceptable and he was happy with the agreement. To substantiate the length of the conversation, Ord produced his telephone company statement showing he was charged for a nine-minute call on May 18.

In contrast, Kovakovich testified that although he received the letter, he did not recall the telephone conversation. Later, for impeachment, his deposition testimony was read. In deposition he testified he had the conversation with Ord but did not recall either agreeing to or objecting to the fees.

The trial court believed the testimony of Ord, and in its statement of decision found: "All conflicts in the testimony concerning the issue of the

---

[2] All statutory references are to the Code of Civil Procedure.

making of the agreement, or its terms, have been resolved in favor of plaintiff." The court determined that a contract had been entered into by the parties during the May 18 telephone conversation, but that it was not a contract founded upon an instrument in writing because "there exists no tangible written indication of the *defendant's* acceptance of the terms of the asserted contract." (Original italics.) Thus, the two-year statute of limitations found in section 339, subdivision 1 applied.

■ We disagree, and hold that under the facts found to be true by the trial court the four-year limitations period of section 337, subdivision 1 governs this case.

In *Amen* v. *Merced County Title Co., supra,* 58 Cal.2d 528, written escrow instructions, on forms prepared by the defendant escrow holder, were signed by sellers of a tavern and plaintiff purchasers. The instructions expressly stated defendant's acceptance of the escrow was subject to the conditions set forth in them. Plaintiff sued for damages, alleging that defendant, negligently and in breach of the agreement, closed the escrow without requiring payment. The Supreme Court not only held the action was upon a written contract, but such a contract may be "in writing" and within the four-year statute of limitations even though it was accepted orally or by an act other than signing. (*Id.* at p. 532.)

Both parties rely upon *Benard* v. *Walkup* (1969) 272 Cal.App.2d 595 [77 Cal.Rptr. 544], a legal malpractice action in which a written contingency fee contract was held to be within the four-year statute even though defendant had not signed it. The agreement was written on defendant's letterhead. Over the portion provided for defendant's signature were the words " 'I accept said employment and agree to do all things necessary to prosecute said claim.' " (*Id.* at p. 599.) Defendant failed to file suit in the underlying personal injury action within the one-year statute of limitations period, and plaintiff sued. The question was whether his suit for breach of the contingency contract was founded on an underlying instrument in writing. The court noted that in order for an action to be founded on an underlying written instrument, the writing had to "contain a contract to do the thing for the nonperformance of which the action is brought." (*Id.* at p. 601.) In other words, the writing must contain the terms of the contract. It cannot be only remotely or indirectly connected with the transaction or only a link in the chain establishing the cause of action.

The *Benard* court rejected defendant's contention that the action was not founded upon an instrument in writing because he had not signed it. It held: "It is well established that the receipt and acceptance by one party of a writing signed by the other only, and purporting to embody all the terms of

a contract between the two, binds the acceptor as well as the signer, to the terms of the writing." (*Benard* v. *Walkup, supra,* 272 Cal.App.2d at p. 602, fn. omitted.)

The language of *Amen* and *Benard* appears to compel the application of the four-year statute to the facts we have under consideration. The terms of the agreement were spelled out in the May 1 letter, the letter was received by Kovakovich, those terms were discussed by the parties during the May 18 telephone conversation, and Kovakovich unequivocally accepted them. Indeed, he said he was happy with them.

However, the trial court refused to conclude that the action was founded upon an instrument in writing because of *James De Nicholas Associates, Inc.* v. *Heritage Constr. Corp.* (1970) 5 Cal.App.3d 421 [85 Cal.Rptr. 233]. Initially, it must be noted *De Nicholas* was appealed following an order sustaining a demurrer, so the only facts the court had to analyze were from plaintiff's second amended complaint. But because *De Nicholas* has been the source of considerable confusion in this case, those limited facts are set out directly from the opinion.

"On or about December 4, 1964, in consideration of plaintiff's waiver of any rights it had to acquire the controlling stock of Security Investment Company of Riverside, and making available to defendant certain material which plaintiff had gathered in attempting to acquire the company, defendant orally agreed to pay plaintiff the sum of $10,000 plus certain expenses incurred by plaintiff.

"On December 7, 1964, plaintiff confirmed the terms of the oral contract by a letter in writing and offered to accept the sum of $13,000 for the consideration set forth therein. On January 22, 1965, defendant made a partial payment to plaintiff in the sum of $5,000. Plaintiff sent a second letter to defendant on January 28, 1965, acknowledging the partial payment. Although plaintiff made demand, defendant refused to pay the balance of $8,000 which is still unpaid." (*Id.* at p. 423.)

The first problem with the plaintiff's position in *De Nicholas* is that it cannot be determined whether the payment of $5,000 by the defendant was performance of its obligation pursuant to the original oral agreement or acceptance of the modified terms set out in the subsequent letter. Plaintiff pleaded no conversation between the parties nor any other action by defendant except the payment of the $5,000. The *De Nicholas* court held, correctly, we believe, that plaintiff had not pleaded any facts which, if true, would prove defendant had accepted the subsequent, written offer from plaintiff which had changed the amount of consideration the earlier oral agreement

had established. It noted that in *Amen,* the fact that the escrow document was a form provided by defendant tended "to indicate defendant's acceptance of the terms." (*Id.* at p. 425.) In addition, the document confirmed the notation that it was accepted by defendant, subject to the terms and conditions set forth. As *De Nicholas* noted, those words are "another indication . . . of defendant's acceptance of the terms." (*Ibid.*)

Likewise, the *De Nicholas* court analyzed *Benard* and noted there was tangible written evidence of defendant's acceptance even though defendant did not sign the agreement.

"Thus, as in the *Amen* case, in *Benard* there was tangible written indication of defendant's acceptance of the terms of the writing, even though defendant did not actually sign the contract." (*James De Nicholas Associates, Inc.* v. *Heritage Constr. Corp., supra,* 5 Cal.App.3d at p. 425.)

From that observation about *Amen* and *Benard,* the *De Nicholas* court proceeded to the conclusion that there must be some written words of acceptance originating with the party to be bound in order to have a contract based upon an instrument in writing. (*Ibid.*) We believe such a requirement is unwise and not mandated by the original case, *Amen,* or any other case that has followed.

As Justice Traynor stated: "If the escrow instructions are in writing and the escrow holder accepts them or if the escrow holder prepares the instructions, offers to perform them, and the buyer and seller accept the offer, an action for failure to comply with the instructions is on a written contract. *The contract may be 'in writing' for purposes of the statute of limitations even though it was accepted orally or by an act other than signing.*" (*Amen* v. *Merced County Title Co., supra,* 58 Cal.2d at p. 532, italics added.)

The requirements are only that there be a writing containing all terms and that there be acceptance by the party to be charged. How that acceptance is manifested is a matter of proof. It may be proved by evidence of words spoken, if believed by the trier of fact. It may be proved by evidence of a particular act other than signing. It may be proved by evidence that the party to be charged prepared the written document and offered to perform its terms. It was this last method of proof, preparation of the document and an offer to perform, that led to the conclusion in *Amen* that the defendant title company had entered into a contract founded upon a written instrument. However, the language of the opinion makes it clear that this method is not the *exclusive* method of proof. Likewise, in *Benard,* the question was how the acceptance by defendant was demonstrated.

The facts before us, as found to be true by the trial court, show precisely what *Amen* and *Benard* require. The letter, containing all the terms of the contract, was prepared and signed by Ord and was received by Kovakovich, who subsequently orally accepted its terms. Thus, the agreement, once it was consummated on May 18, became one that was founded on an instrument in writing.

Were we to hold that under the facts as presented to us the two-year statute of limitations controls, the contract would be governed by two different limitation periods, depending upon which party brought suit. Had Kovakovich filed a complaint for breach of contract, alleging Ord's failure to perform the services required of him in the May 1 letter, the applicable statute of limitations period would, under any analysis, be four years pursuant to *Amen*. To hold that the controlling limitations period depends upon who files suit would be an unfortunate anomaly.

The applicable statute of limitations was four years pursuant to section 337, subdivision 1.

### Accrual of the Cause of Action

The relevant dates which we must consider in determining whether Ord's complaint was filed within the four-year statute of limitations are the following:

— June 20, 1979, when the stipulated tax court decision was filed;

— Just prior to March 19, 1980,[3] when the Internal Revenue Service recomputed its tax assessment against Kovakovich;

— March 21, 1980, when Ord advised Kovakovich of the amount due based upon Jack Stuart's calculations;

— January 11, 1984, when suit was filed.

The period of limitations begins at the time a cause of action accrues. Section 312 provides: "Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute."

---

[3] The precise date of the Internal Revenue Service recomputation is not disclosed by the record. Stuart testified he calculated the tax saving soon after receiving the new figures. His calculation is dated March 19. We also know that as of January 4, 1980, the date of a letter from Ord to Kovakovich, the assessment had not been recalculated.

The issue, then, is when Ord's cause of action accrued. If it accrued on June 20, 1979, the date of the tax court decision, his action is barred, even under the four-year statute of limitations. If it accrued on or after January 11, 1980, the complaint was timely filed.

The trial court held the action was barred because the accrual date was June 20, 1979. In its statement of decision, it found: ". . . the lawsuit was untimely even if the four years of C.C.P. § 337(1) applied, for the plaintiff's cause of action, in the Court's estimation, accrued on June 20, 1979, the date of entry of the tax court judgment. That was the moment in time when the services entitling plaintiff to be paid were completed."

Ord, on the other hand, argues that the accrual date was when the Internal Revenue Service mailed its amended assessment notice in March 1980. He contends that until the taxes, penalty and interest owed by Kovakovich were recomputed, his obligation to perform services was not completed.

■ It has long been established a cause of action based upon a breach of contract accrues at the time of the breach. (*Niles* v. *Louis H. Rapoport & Sons* (1942) 53 Cal.App.2d 644, 651 [128 P.2d 50].) In the case of a personal performance contract, defendant breaches his obligation to pay at the time plaintiff completes performance of the requested act. (*Morehouse* v. *Morehouse* (1903) 140 Cal. 88 [73 P. 738], overruled on other grounds in *Tabata* v. *Murane* (1944) 24 Cal.2d 221, 231 [148 P.2d 605].)

*Cullinan* v. *McColgan* (1927) 87 Cal.App. 684 [263 P. 353] states the principle in the context of an action for the reasonable value of attorneys' fees based upon quantum meruit. The date the services were performed is the critical time in determining whether the statute of limitations bars the action. The court approved a jury instruction which read, in part: " '. . . the plaintiffs cannot recover for any services they claim to have rendered, and which services were completed more than two years prior to the date on which this action was commenced. . . .' " (*Cullinan* v. *McColgan, supra,* at p. 692; see also *Mitchell* v. *Towne* (1939) 31 Cal.App.2d 259, 263 [87 P.2d 908].)

As we previously noted, the trial court found that Ord's services were completed on June 20, 1979, the date the stipulated judgment was filed with the tax court. If the evidence supports the finding that the work to be performed by Ord was finished on that date, then the conclusion of the trial court is correct.

■ In reviewing an issue of fact, this court determines only whether there is substantial evidence to support the finding. All evidence which

tends to establish the correctness of the finding must be accepted as true, and all inferences which the trial court could have reasonably engaged in must be followed. (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140 [134 P. 1157].) Although many courts have attempted to articulate the definition of "substantial evidence," one of the more precise is found in *Estate of Teed* (1952) 112 Cal.App.2d 638 [247 P.2d 54], which states: ". . . if the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Id.* at p. 644.)

In order to determine whether the finding that Ord's services were completed on June 20, 1979, was supported by substantial evidence, we have undertaken a careful review of all testimony which bore upon the issue either directly or inferentially. First, Kovakovich and Todisco were adamant that Ord was not to receive 50 percent of the reduction in tax assessment, interest and penalty unless the case actually went to trial. Therefore, according to them, no contingency fee contract, oral or written, ever became effective, and the $2,000 retainer fee paid by Kovakovich satisfied his total obligation. The trial court specifically rejected that testimony, and we are not concerned with it in this analysis.

Ord touched upon the subject only briefly when he testified: "Q. What remained to do after the stipulation was entered into?

"A. You had to check, the Government makes mistakes too, and you had to review the computation that the Government made when they sent out the final tax bill, because that's what the assessment is going to be based on.

"Q. And if it was incorrect, what action would you take?

"A. Then you meet with the Government attorney and you try to satisfy if there's an error, if they don't agree, then you have to file a motion with the court and have the court determine under Rule 50 what it should be."

Stuart described his duties and those of Ord as follows: "Q. Okay. And do you know what Mr. Ord's role was in this case as you were assisting—assisting in it?

"A. Well, it was my job to find the area where—where we possibly could make adjustments, and then discuss them with Mr. Ord. And it was his—his responsibility to take the case from there—from there on."

Later testimony of Stuart discloses the importance of having the corrected calculations and assessment from the Internal Revenue Service: "Q. Okay. Now, Mr. Stuart, were you—at that time of the settlement were you able to calculate the tax savings to Mr. Kovakovich in this case?

"A. At this particular time?

"Q. Yes, at that time?

"A. No.

"Q. Can you tell me what events would have to occur before you would be able to calculate the actual tax savings?

"A. Well, first we wanted to get the actual tax computations that were made. This was just the settlement figure.

"Q. Okay. And who would you have gotten those tax computations from?

"A. Well, they eventually come down through the service.

"Q. Okay. And does that take a period of a couple of months?

"A. Sometimes it takes quite a while.

"Q. Okay. Mr. Stuart, let me show you what has been marked as Plaintiff's Exhibit 8, and let me ask if you recognize that group of materials? I'm sorry, I have an extra one here.

"A. A letter, I do.

"Q. Mr. Stuart, do you recall sending this letter to Mr. Ord?

"A. Yes.

"Q. Do you recall if this was the first time you had informed Mr. Ord as to the actual tax savings in the Tax Court case?

"A. Yes.

"Q. And do you recall why it took until March 19th, 1980, to do these calculations and inform Mr. Ord?

"A. Well, I don't have the document here, but we were waiting for the report from the Internal Revenue Service before I made any computations.

"Q. Okay. So do you recall if you prepared these computations soon after receiving the papers from the Internal Revenue Service?

"A. I'm sure I did, because we were anxious to get the case closed."

We conclude that the only evidence "reasonable in nature, credible, and of solid value," indeed, the only evidence of any kind, leads to the inescapable conclusion that Ord's services were not completed until the Internal Revenue Service recomputed the Kovakoviches' tax assessment in March 1980. The trial court's finding that Ord's services were completed June 20, 1979, is not supported by substantial evidence. The complaint was filed within the four-year limitations period.

The judgment is reversed and the trial court is directed to enter judgment in favor of appellant and against respondents for $15,121.50, plus interest from the date of the contract breach. Appellant is to recover costs on appeal.

Hamlin, Acting P. J., and Brown (G. A.), J.,* concurred.

---

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.